UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs                                             Case No: 13-CR-20496
                                                Honorable Victoria A. Roberts

JIM SAYED,

    Defendant
_____/

**<u>ORDER ACCEPTING GOVERNMENT'S COMPUTATION OF LOSS</u>**

**I.**     **INTRODUCTION**

Defendant Jim Sayed ("Sayed") pled guilty pursuant to a Rule 11 plea agreement to one count of Food Stamp Fraud in violation of 7 U.S.C. § 2024(b). Sayed and the Government agree on the application of the relevant Sentencing Guidelines, except for the amount of loss under U.S.S.G. § 2B1.1(b)(1). The Government proposes two methodologies to determine the amount of loss: the "comparative" and the "pre-and-post search warrant." These methods place the loss amount in the range of $400,000.00 to $1 million. Sayed objects to the Government's methodologies. He says the Court should use a "cost of sales" or "net gain" approach to calculate the loss amount, which would place the amount of loss in the range of $135,000.00 and $196,000.00.

The Court agrees with the Government's comparative methodology and accepts the calculations.

**II.     BACKGROUND**

Sayed owned and managed H & J Fish Market ("H & J"), a seafood specialty store, which sold uncooked fish, hot fish sandwiches, and hot dinners. From July 2010 to September 2011, Sayed committed food stamp fraud by allowing food stamp recipients to redeem food stamp benefits in exchange for cash and other prohibited items.

Both parties filed sentencing memorandums on how to calculate the amount of loss; the Court held two evidentiary hearings.

The first calculation approach the Government proposes compares H & J's monthly food stamp redemption to the monthly food stamp redemption of comparable fish markets. The monthly food stamp redemption levels of four comparable stores were averaged, and this average is subtracted from H & J's monthly redemptions. The difference between H & J's food stamp redemptions and the comparable stores' average represents a monthly estimate of H & J's food stamp fraud.

During the evidentiary hearing, the Government presented testimony from Special Agent Caleb Casselman of the United States Department of Agriculture. He explained the qualifications used in choosing the comparative stores. Casselman testified that comparative stores must have a similar food classification, which in this case was seafood specialty. The stores had to be within a seven mile radius, and serve the same demographic and geographical areas. Moreover, the stores had to accept food stamp benefits during the same time frame that H & J did.

Using the comparative method, the difference between H & J's food stamp redemptions and four other seafood specialty stores is $462,347.16.  And, the difference

between H & J's food stamp redemptions and the three stores that redeemed the most food stamps is $406,665.98.

The second method, the pre-and-post search warrant methodology, compares H & J's monthly food stamp redemptions prior to the execution of the search warrant to the amount of monthly redemptions immediately following the execution. The theory is that all fraudulent food stamp redemptions will stop after a criminal investigation becomes overt, and the post-search warrant number will reflect the true amount of non-fraudulent food stamp redemptions. In the month before the search warrant was executed, H & J redeemed $106,656.16 in food stamps. In the full month following execution, H & J redeemed $2000.59 in food stamps. Subtracting the $2000.59 figure from the food stamp redemption amounts of the preceding 14 months, the amount of loss is $859,372.06. The Government also proposed giving Sayed the benefit of the doubt and calculated the loss amount as if H & J redeemed $20,000.00 or $25,000.00 post execution. The amount of loss using those figures would be $589,380.91 and $514,380.91 respectively.

Sayed says the Court should use a "cost of sales" or a "net gain" method. The cost of sales methodology takes into account H & J's sales and business costs, and compares those costs to industry costs. It computes how much profit and costs H & J earned in excess of what is the expected earnings and costs for the industry. The "net profit" or "net gain" approach takes into account the legitimate benefits conferred upon a food stamp recipient. Sayed notes that the net gain approach was used by the Sixth Circuit in *United States v. White*, 492 F.3d 380 (6th Cir. 2007) to calculate Medicaid fraud.

Sayed says these methodologies accurately reflect the true amount of loss. Sayed presented expert testimony from Brenda Orlando ("Orlando"). Orlando conducted a forensic

analysis of H & J's financials for both methods. She examined business records, tax returns, and banking and accounting records from H & J. She also examined H & J's transactions with vendors. She compared H & J's financials to industry data from 93 stores. Using this approach, Orlando determined the amount of loss would range from $135,000.00 to $196,000.00.

## III. DISCUSSION

A district court need only make a reasonable estimate of loss if the losses occasioned by the fraud are difficult to quantify. U.S.S.G. § 2B1.1, cmt. n. 3(C); *United States v. Sufi*, 456 Fed App'x 524, 528 (6th Cir. 2012). Precision in calculating loss is not required. *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2010). And, a district court must calculate the amount of loss based on a preponderance of the evidence. *United States v. McCarty*, 628 F.3d 284, 290 (6th Cir. 2010).

The Government's comparative method is reasonable. It has been adopted by three courts within this district, and the Sixth Circuit has twice upheld the method in cases involving food stamp fraud. *See*, *Sufi*, 456 Fed.App'x at 524; *United States v. Sufi*, 455 Fed.App'x 672 (6th Cir. 2012). Special Agent Casselman's testimony demonstrates the comparative stores are carefully selected using logical criteria.

On the other hand, Sayed's methodology compared data from H & J to 93 other stores, but it fails to take into account that not all 93 stores accept food stamp benefits, and not all 93 stores serve the same specialized products as H & J. Moreover, Sayed's net gain methodology is inconsistent with the view that once fraud is committed during any part of a food stamp transaction the entire transaction is tainted. Thus, it is irrelevant if part of the transaction is legal and the customer received a partial non-fraudulent benefit.

4

See, *United States v. Barnes*, 117 F.3d 328, 335 (7th Cir. 1997) noting ("the definition of loss applicable herein is 'the value of benefits from intended recipients or uses.' True, as [defendant] suggests, the Food Stamp Program's intended recipients did receive [partial] benefits after [defendant] received his commission. What [defendant] fails to recognize, however, is that his fraudulent scheme diverted a full one-hundred percent of the value of the food stamp coupons he purchased from their intended 'use'- the purchase of specified food products from authorized retailers.").

The Court accepts the Government's computation of H & J's food stamp fraud, and determines the loss amount to be in the range of the $400,000.00 to $1 million. Using this loss amount range, the offense level for purposes of calculating the sentencing guideline range is 18. Sayed's guideline range is 27 to 33 months.

**IT IS ORDERED.**

Dated: December 15, 2014.

S/Victoria A. Roberts<br>
Victoria A. Roberts<br>
United States District Judge

Dated:  December 15, 2014

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 15, 2014.<br><br>s/Linda Vertriest<br>Deputy Clerk |